**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

JESSICA GARCIA, on behalf of her minor
child, MYISHA GARCIA,

      Plaintiff,

v.                                     CIV. NO. 05-0062  WPJ/WPL

BOARD OF EDUCATION OF ALBUQUERQUE
PUBLIC SCHOOLS, ELIZABETH EVERITT, in
her individual and official capacity, DEBI HINES,
in her individual and official capacity,

      Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>
<u>**GRANTING SUMMARY JUDGMENT ON RACE DISCRIMINATION CLAIMS**</u>

THIS MATTER comes before the Court upon Defendants' Motion for Summary

Judgment on Race Discrimination Claims, filed March 29, 2006 **(Doc. 85)**.  This case concerns

the provision of public education to a minor student by the Albuquerque Public Schools.[1]  Having

considered the parties' briefs and the applicable law, I find that Defendants' motion is well-taken

and will be granted.

**BACKGROUND**

This is a civil action brought by Plaintiff Jessica Garcia on behalf of her daughter, Myisha,

against the Board of Education of Albuquerque Public Schools (hereinafter referred to as "APS"

---

[1]  The minor student, Myisha Garcia, will turn eighteen in June 2006.  Legal standing
under the IDEA will shift from Jessica Garcia to her daughter, Myisha, at that time.   N.M.S.A.
1978, §28-6-1 (age of majority); 20 U.S.C. § 1415(m) (transfer of parental rights); 34 CFR §
300.517 (same).   <u>See</u>, Doc. 92 (Pltff's IDEA brief).

or "District") and two individual defendants following exhaustion of administrative due process

proceedings pursuant to the Individuals with Disabilities Education Act ("IDEA").  Defendant

Elizabeth Everitt, during the relevant time in this lawsuit, was the Superintendent of APS.

Defendant Debi Hines was the director of special education.

Plaintiff seeks partial reversal of the administrative IDEA decision dated December 20,

2004.[2]  Plaintiff also asserts that APS violated the rights of her daughter, Myisha, to equal

protection under 42 U.S.C. § 1983, failed to provide a public education free from disability under

Title II of the ADA and Section 504 of the Rehabilitation Act of 1973, and discriminated against

Myisha on the basis of race under Title VI  of the Civil Rights Act of 1964.  The motion

addressed by the Court here concerns only Plaintiff's race discrimination claims.

I.    **Parties' Positions**

Plaintiff's core allegation concerning APS' failure to provide Myisha with a free,

appropriate public education is that APS violated Plaintiff's rights by denying her daughter access

to reading instruction in the Wilson Reading System, a multisensory language program.  This is

based on several specific allegations: the District failed to have any Wilson-trained teachers of

reading at West Mesa High School ("West Mesa"); the District's policy allowed teachers to

volunteer to get Wilson training; and the District failed to assign teachers with the higher level of

training to schools with a high level of need.  Plaintiff contends that Defendants Everitt and Hines

("Individual Defendants") knew the student body composition at West Mesa according to race

and disability, and knew about the general lack of appropriate training among APS's teachers for

_____

[2]    The Due Process Hearing Officer ("DPHO") ruled in APS' favor on all issues.  The
Administrative Appeal Officer ("AAO") ruled in APS' favor on all but one issue.

teaching reading as well as the graduation/drop out rates at the school.  Yet the Individual

Defendants, according to Plaintiff, chose and implemented a policy which failed to provide

students at West Mesa, including Myisha, access to reading instruction equally effective to that

provided to students in other schools, based on race and disability discrimination against such

students.

Defendants take the position that Myisha and her mother's indifference to Myisha's

education undermined the effectiveness any services could have had for Myisha during 2002-03

and 2003-04.  Defendants contend that Myisha herself bears responsibility for behaving in ways

which crippled her academic progress, including truancy and escalating behavior problems.[3]

## II.    Undisputed Facts

Plaintiff states that Defendants' presentation of facts are taken out of context and are

misleading, yet Plaintiff does not dispute these facts because she considers them to be immaterial.

The Court disagrees with Plaintiff's wholesale characterization of Defendants' facts as immaterial.

I find that they are material because they reflect on the issue of whether Myisha's failures in

school are attributable to the District's illegal motives of racial discrimination (in that the District

denied her Wilson training), or to other factors outside of the District's control.  However,

because Plaintiff does not dispute these facts, the Court assumes them as true for purposes of this

motion for summary judgment.

Defendants' statement of undisputed facts are supported by the testimony of Plaintiff-

Student ("Myisha Garcia" or "Myisha") in the course of the administrative hearing or by

deposition; deposition testimony of Jessica Garcia, Myisha's mother; testimony by affidavit and

---

[3]  The parties' positions are taken from the Initial Pretrial Report. (Doc. 20, at 3-10).

deposition by APS employees who are involved in the special education reading programs; and APS' exhibits admitted at the administrative hearing; administrative findings of fact.[4]  Citations to this evidence are provided by Defendants in that portion of their brief which sets out the undisputed facts.

Myisha Garcia is African-American and Hispanic.  She is 17 years old, and until she recently dropped out of school altogether, she was a sophomore at Del Norte High School ("Del Norte").  Myisha qualified for receipt of special education services for "specific learning disability" for deficits in the area of reading in her fifth grade year (1989-1999) at APS.  Myisha's reading disability was diagnosed in fifth grade.  Her school attendance was fine until the second semester of eighth grade when she stopped coming to school.  According to Myisha's mother, Jessica, and one of Myisha's special education teachers (Lorraine Luna), Myisha's attendance dropped when her rebellious attitude, her exposure to negative peer influences, her drug use, and her conflicts with her family began to manifest themselves in her life.

A.    2002-2003 School Year

Myisha began ninth grade at West Mesa in the fall of 2002.  During the fall of 2002, Myisha was enrolled in Corrective Reading, which is an intensive phonics-based program, identified as a supplemental reading intervention program for students in special education classes. Myisha's teachers did not have the opportunity to implement the Corrective Reading method with Myisha because Myisha never once attended the class.  Plaintiff states that there is a fact issue as to whether specialized reading instruction was ever made available to Myisha, but Plaintiff's own

---

[4]  Defendants filed the Administrative Record with the Court on April 27, 2006 (Doc. 100).

evidence does not support such a dispute:

> Q.      Did Myisha get the program [Corrective Reading]?
>
> A       Not where it was on her schedule.  But I do know that her freshman year. . . her English I class that she had with Deb Hernandez, they had that reading program as part of the curriculum.

Pltff's Ex. 6 at 156:3-9.  Defendants also present evidence showing that Myisha did receive

reading instruction:

> "In the 2002-03 school year, Myisha Garcia was on Deb Hernandez' class list for Corrective Reading, but she never came to class and, accordingly, was dropped from the class."

Defts' Ex. "Kisner Aff." ¶ 13; see also, Due Process Hearing Transcript ("DPH Tr.") at 196-97

(guided reading on variety of levels offered in Myisha's 10th grade English class, with help

offered on individual basis).

According to her own testimony, Myisha did not put any effort into schoolwork during the

fall 2002 at West Mesa because she thought she would be able to pass her classes without trying.

Myisha did not attend West Mesa in the spring of the 2002-03 school year because she was

arrested and charged with aggravated battery and aggravated assault against a household member

for attacking her mother and brother with a deadly weapon.  Myisha resided at the Bernalillo

County Juvenile Detention Center from January 17, 2003 to March 7, 2003 and again from July

24, 2003 to August 13, 2003.  During part of that time, Myisha was placed at the Mesilla Valley

Residential Treatment Center.

B.      2003-2004 School Year

Myisha's lack of interest  for her schooling continued in the fall of 2003.  The efforts of

her teachers, her Student Success Advocate, and her mother to address the issue were met with

defiance from Myisha.  The first semester of the 2003-04 school year, Myisha received numerous

disciplinary referrals for truancy.  Of 89 school days in the 2003 fall semester, Myisha had 65 days

showing unexcused absences most for a full day of classes.

Myisha intentionally began to act "bad" during the time period relevant to this dispute

because she wanted to provoke her mother's then-boyfriend to move out of their home.  She

acted "bad" by skipping school, although she controlled such problem behavior when she wanted.

Plaintiff has argued that Myisha skipped English classes because she was allegedly

frustrated by an inability to read and because of the allegedly inadequate instruction she received

in those classes.   Myisha admitted, however, that she would go to her English classes when she

"felt like going" regardless of whether she was keeping up with the class.  Myisha's motivations

for skipping were highly variable.  She usually attended first period because it was "too cold to

ditch." Sometimes her decision to skip depended upon whether she "was in the mood to sit

there."  Myisha used drugs and alcohol during this period, sometimes during the school day.  She

would skip chemistry because "it was better just to go to sleep" than attend chemistry class.

Myisha ran away from home twice, for about a week each time, missing school as a result.

In December 2003, Myisha became pregnant.  Her mother was so upset that Myisha's

parole officer feared for Myisha's safety and moved her to a day shelter.  Myisha missed the rest

of her 2003 fall classes, including finals.  On both levels of the administrative process (Due

Process Hearing, and the Administrative Appeal), the hearing officers concluded that Myisha's

own attitudes toward school mitigated the effectiveness that any instruction would have had.

C.    <u>2004-2005 School Year</u>

In the 2004-05 school year, Myisha transferred to Del Norte and was enrolled in a Wilson

class.  Myisha earned a 4.0 grade point average for that period.  Myisha herself attributes this

academic success to good attendance at school, because she wanted to improve her grades and

get her diploma.  She also began to speak up and ask for help when she needed it, and attended

classes even if they were not interesting to her because she recognized that she "was learning

something" anyway.

The 2004-05 school year at Del Norte was "the beginning of everything getting started,"--

that is, the beginning of a new Myisha.  According to Defendants' presentation of the facts,

depending on the test she takes, Myisha is reading at the 9th grade level.

D.    2005-2006 School Year

In the 2005-06 school year, Myisha was again enrolled in a Wilson class.  However,

Myisha started exhibiting her old behavior again, ditching classes, even those in which she was

having no difficulty.  Jessica Garcia ("Jessica") suspects that her daughter began using drugs again

this year.  Myisha ran away from home again in October 2005.  She returned home when her

father was temporarily out of jail, but left after her father was sent back.  Jessica kicked Myisha

out of the home three days before the second semester of the 2005-06 school year began.

Defendants point out the similarities between Myisha and her mother, Plaintiff in this

action.  Although Jessica Garcia does not have a reading disability, like her daughter, Jessica used

drugs and alcohol in high school.  Jessica ditched classes when she began to struggle

academically.  Jessica also got pregnant in high school, and eventually dropped out of high school

completely.

Plaintiff states that she knows her daughter better than anyone in APS, but admits that

even she cannot always control Myisha.  When asked why her parents have not forced her to stay

in school, Myisha states that her parents "know they can't make me do anything I don't want to do."

Defendants contend, in the form of factual statements supported by testimony and other exhibits, that until recently, Myisha's mother did not provide consistent discipline for Myisha at home and may not have been sufficiently involved with Myisha's schooling to provide support for her academic success.  Myisha continues to acknowledge that school is important, but has now dropped out of high school, and lives with her boyfriend.   Myisha states that she wants to go home but does not want to go back alone, without her boyfriend.  Myisha states that her home situation has impacted her ability to concentrate on school.

E.    Reading Programs

Both parties provide background details concerning the inception of the various reading programs currently used in the country.  While most of these details are superfluous to the issues before the Court in addressing the instant motion, some general discussion is necessary, since Plaintiff alleges that APS discriminated against Myisha by denying her access to the Wilson reading system.

A 1997 Congressional consultation with the U.S. Secretary of Education spawned a national report three years later which assessed the effectiveness of different types of reading approaches used to teach children to read (National Reading Panel, or, "NRP" Report).  The NRP's 2000 Report has driven the delivery of reading instruction embodied in the No Child Left Behind Act ("NCLB") which requires teachers to use scientific research-based general education reading instruction to prevent reading failure through early intervention in grades K-3.

The different reading programs are built on the various essential components of reading

(e.g., hearing the sounds in words and reading text accurately and fluently).   The Orton-Gillingham-based reading programs are direct, sequential, multisensory forms of instruction.  APS provides voluntary training for special education teachers in three Orton-Gillingham-based programs.  The Wilson Reading System ("Wilson") is one of these programs.  Wilson certification is a multi-step process, involving a 2-day overview and a one-year long practicum, leading to Level I certification.  Some teachers also continue on with advanced training in Level II Certification.

Special education teachers throughout the District use other phonics-based programs which also provide direct, sequential, explicit reading instruction for students with learning disabilities, e.g., Corrective Reading.  Both Wilson and Corrective Reading meet the requirement of the NCLB Act, as do numerous other reading programs.  Both of these reading programs are currently used by teachers at West Mesa.

**III.  Additional Facts Presented by Plaintiff**

The majority of Plaintiff's additional facts concern APS' use of the Wilson Reading System, e.g., details concerning funding support and the process by which the Wilson Reading System came to be offered in the District.[5]  Most of these facts are not relevant to Plaintiff's racial

---

[5]  Throughout Plaintiff's statement of additional facts, Plaintiff refers the Court to exhibits attached to pleadings addressing other motions, which the Court finds to be an acceptable practice under the local rules.  See, D.N.M.LR-Civ. 10.7.  However, Plaintiff fails to either designate in the citation (*or* highlight, as required in D.N.M.LR-Civ.10.6) specific references which support the statement of facts.  Some of the materials are depositions which are 40 pages long.  See, e.g. Statement of Additional Facts 7.

The Court has neither the time nor the desire to search the record which should be identified by a party.  See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995) ("[S]ufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein. . . [without a specific

discrimination claim except for Plaintiff's contention (supported by these facts) that Wilson training was not required of APS teachers, but rather was offered and recommended, to special education teachers.  However, this contention is not only *not* disputed by Defendants, but offered in their own statement of undisputed facts ("SMF").  <u>See</u>, SMF 45.  In spite of the purely voluntary nature of the Wilson training offered to APS teachers, there has been no difficulty filling the Wilson training classes with willing participants.  <u>See</u>, <u>e.g.</u>, Pltff's Ex. 6 at 457 (attached to Doc. 41, response to Deft's Mot. for Sum. J. Based on Qual. Imm.).

There is no dispute regarding the importance of the ability to read for academic success, no dispute concerning Myisha's need for reading instruction intervention and no dispute that APS has invested resources in terms of time and money in providing Wilson Reading training to some educators in the District.  The sole dispute here is whether the fact that Myisha did not receive that particular type of reading instruction during the school years 2002-03 and 2003-04 constituted discrimination based on race.

## DISCUSSION

Plaintiff contends that APS discriminated against Myisha by denying her access to the Wilson reading method during the 2002-03 and 2003-04 school years, and by making use of Wilson for special education students voluntary instead of making it a requirement.  In addition, Plaintiff contends that APS denied her daughter a free, appropriate and public education.  Specific acts which she describes as racially discriminatory are: that West Mesa "kicked out" or disenrolled her daughter in the spring of 2004, and that Del Norte refused to accept Myisha at that time.

---

reference] we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury"), <u>accord</u>, <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs").

Jessica Garcia Dep. at 149-150:16-25, 1-19.

I.      **Legal Standards**

Summary judgment is only permissible where "pleadings, depositions, . . . and admissions . . . , together with the affidavits, . . . show that there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "The factual record and all reasonable inferences therefrom must be viewed in the light most favorable to the party opposing summary judgment." <u>Cross v. The Home Depot</u>, 390 F.3d 1283, 1284-85 (10th Cir. 2004).

Plaintiff's racial discrimination claim is brought under Title VI, which states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Title VI, § 601, 42 U.S.C. § 2000d; <u>see</u>, <u>Maldonado v. City of Altus</u>, 433 F.3d 1294, 1302 n.1 (10th Cir. 2006). A plaintiff alleging racial discrimination under Title VI must demonstrate ultimately that "there is a genuine issue of material fact that the program receiving federal assistance acted with discriminatory intent or motive to survive summary judgment on a Title VI claim." <u>Black Educ. Network, Inc. v. AT & T Broadband, LLC</u>, 154 Fed.Appx. 33, 44 (10th Cir. 2005) (citation omitted).

Plaintiff cannot overcome several major flaws in her case: (1) Plaintiff cannot circumvent the Supreme Court's directive that the right to choose particular services or programming is reserved for school personnel, and not for students or their parents; (2) she offers no rebuttal or facts creating an issue regarding whether minority students benefit less from APS special education reading instruction; and (3) she offers absolutely no evidence from which a reasonable

11

fact finder could infer that any decision made by the District with regard to Myisha's curriculum or attendance at a particular school was tainted by racial animus. I address in turn each of three theories underlying Plaintiff's allegations of racial discrimination under Title VI.

## II.   Constitutional Right to Preferred Reading Programs

According to the United States Supreme Court, the provision of a "free appropriate public education" ("FAPE") implies that the education to which access is provided "be sufficient to confer some educational benefit upon the handicapped child." <u>Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley</u>, 458 U.S. 176, 200 (1982) (declining to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act).

Under the Education for All Handicapped Children Act, § 612(1), as amended, 20 U.S.C. § 1412(1), the term "free, appropriate and public education" refers to special education and related services which (a) have been provided at public expense, under public supervision and direction, and without charge, (b) meet the standards of the State educational agency, (c) include an appropriate preschool, elementary, or secondary school education in the State involved, and (d) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title." <u>See</u>, 20 U.S.C. § 1401(18). However, the Supreme Court noted in <u>Rowley</u> that:

> "while Congress sought to provide assistance to the States in carrying out their constitutional responsibilities to provide equal protection of the laws, it did not intend to achieve strict equality of opportunity or services for handicapped and nonhandicapped children, but rather sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education. The Act does not require a State to maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children.

Plaintiff argues, without framing it as a separate claim, that APS has denied Myisha the minimal requirement of "some educational benefit" (as envisioned under Rowley) because Myisha did not receive Wilson training in the school years 2002-03 and 2003-04. See Resp. at 12-15. Not only does Plaintiff fail to present any evidence to support this legal conclusion, but the evidence Plaintiff does present leads only to an opposite conclusion. By Myisha's own testimony, she did well academically -- that is, benefitted from the education she was offered -- when she chose to attend class, sought help from teachers, and applied herself. Myisha's academic success was established by her achievement of a 4.0 grade point average in the 2004-05 school year. No reasonable juror would find that denial of a particular reading program resulted in a denial of the minimum level of educational benefit public schools are required to provide under federal law, particularly when it is undisputed that prior to 2004-05, Myisha never attended a class of the Corrective Reading program in which she was enrolled at West Mesa.

Defendants contend that Plaintiff impermissibly seeks an order from this Court requiring APS to mandate that teachers receive training in Plaintiff's preferred reading methodology. Defendants contend that it is neither a parent's prerogative, nor a court's, to choose among appropriate educational methodologies. Defendants are correct.

Courts have made it clear that the right to choose particular services or programming is reserved for school personnel, not for students or their parents:

> In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States. . . . **The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child**. The Act expressly charges States with the responsibility of "acquiring and disseminating to teachers and administrators of programs

13

for handicapped children significant information derived from educational research, demonstration, and similar projects, and [of] adopting, where appropriate, promising educational practices and materials." . . . . In the face of such a clear statutory directive, it seems highly unlikely that Congress intended courts to overturn a State's choice of appropriate educational theories . . . .

458 U.S. at 207-08 (emphasis added).

Plaintiff concedes that a student with a reading disability does not have a constitutional right to receive reading instruction from a teacher who has been trained in the Wilson Reading System.  Deft's Ex. 3 (Resp. to Req. for Adm. No.1).  Nevertheless, Plaintiff maintains that once Wilson was "chosen" by APS in 2002, APS should have either offered Wilson to all students who needed the instruction, or should have had some rational basis for distribution of what Plaintiff describes as "a rare commodity."  Resp. at 13.[6]  To say that "Wilson Reading is the program APS chose" (Resp. at 13) is both inaccurate and incomplete.  There is no evidence that APS selected or implemented Wilson as the preferred reading program in the District.  Defendants acknowledge that APS endorses Wilson by providing training to special education teachers across the District, but also notes that this endorsement does not mean that APS considered other reading methodologies to be inappropriate for APS students.  See Stotts Aff., ¶ 17 ("Although the Wilson Reading Program is an effective reading program for students with phonological processing problems, it is not appropriate for every child with a learning disability")[7] & ¶ 20 ("The Wilson

---

[6]  The Court notes with some irony that Plaintiff's counsel has taken the opposite position in another case being litigated against APS: "APS's refusal to consider the individual learning needs of students with reading disability and instead always requiring that such students receive training from "Wilson" trained personnel discriminates against some students with reading disability. . . ."  Complaint, ¶ 52, Civil No. 05-502 MCA/WPL; see also Defts' Mem. Brf., at 3 n.3.

[7]  Melissa Stotts is the Special Education Reading/Learning Disabilities Coordinator for APS.  In this position, Ms. Stotts supervises the reading/math liaison teachers who deliver

Reading Program is one that the APS Special Education Department supports.  The Special Education Department's support of certain programs is not intended to rule out school choices to use other appropriate programs"); Kisner Aff., ¶ 9 ("There is more of an emphasis on spelling in Wilson, but there is actually more reading in Corrective Reading"); Ex. 2 to Tafoya Aff. (models of various reading programs, all of which comply with the NCLB Act). Plaintiff presents no evidence which raises factual questions regarding APS' stated intentions on its use of the Wilson Reading System.

Susanne Kisner, a special education teacher at West Mesa, testified that "Myisha is the type of student who would have benefitted from Corrective Reading instruction as long as she would have come to school and participated in the program."  Kisner Aff., ¶ 14.  Plaintiff raises a factual issue regarding whether Corrective Reading was the best reading program for Myisha, through the testimony of Ms. Huschka, department chair of West Mesa's special education programs.  Ms. Huschka stated that Myisha's testing scores were not typical scores of someone who is put into the Corrective Reading program at West Mesa.  Pltff's Ex. 6 at 165-66. However, any factual disputes regarding disagreement among reading specialists or teachers as to the appropriateness of a particular reading program for certain students would not rise to an issue of constitutional proportions.  Further, as I have just concluded, the holding in <u>Rowley</u> effectively precludes a claim based on APS' choice of reading program offered to Myisha.

Defendants have admitted from the start that opportunities for teacher training in the Wilson program were not mandatory.  <u>See</u>, Tafoya Aff., ¶ 9; Stott ¶ 22.  Thus, Plaintiff's position on this issue is inconsistent: Plaintiff concedes that there is no inherent right to a particular reading

professional development for special education teachers in APS schools.  <u>See</u> Stotts Aff., ¶ 3.

program, yet proceeds to argue that the voluntary nature of the Wilson training for teachers and the selective use of the program violates Plaintiff's rights under Title VI.  If there is no constitutional right to a particular reading program, then APS' wisdom in offering other reading programs in conjunction with Wilson is not an issue relevant to Plaintiff's Title VI claim.

In a Title VI claim, such as Plaintiff alleges here, the only question which concerns the Court is whether the provision of, or withholding of, certain reading programs was done selectively to favor non-minority handicapped (or special education) students, or was shown to be based on race.  I address this question next, in the context of whether APS' use of the Wilson Reading System had a disparate impact on minority special education students, and whether any of Defendants' conduct toward Myisha was carried out with illegitimate, racially discriminatory motive.

## III.    Disparate Impact Theory

According to Plaintiff, APS chose Wilson as the reading method of choice (which the Court has found to be a conclusory allegation, see discussion above), and then selectively chose to offer Wilson to more special education non-minority students than special education minority students, thus creating a disparate impact on the minority students.

Plaintiff does not expressly state a disparate impact claim under Title VI, although Defendants characterize it as such, based on Plaintiff's allegations and argument.  A disproportionate or disparate impact exists when a defendant's racially neutral practice detrimentally affects persons of a particular race to a greater extent than other races.  Powell v. Ridge, 189 F.3d 387, 394 (3d Cir.1999), overruling on other grds. recognized by, South Camden Citizens in Action v. New Jersey Dept. of Environmental Protection, 145 F.Supp.2d 505, 31

16

Envtl. L. Rep. 20,675 (D.N.J. May 10, 2001); see, Villanueva v. Carere, 85 F.3d 481, 487 (10th

Cir. 1996) (disparate impact claim involves comparison of the statistical impact of [defendant's]

decisions on the class allegedly harmed, i.e. Hispanics, relative to a relevant comparison group).

Title VI § 601 prohibits exclusion from participation in, denial of benefits of, and

discrimination under federally assisted programs on grounds of race, color, or national origin.

Although Title VI itself proscribes only intentional discrimination, certain regulations promulgated

pursuant to Title VI prohibit actions that have a disparate impact on groups protected by the act,

even in the absence of discriminatory intent.  Villanueva v. Carere, 85 F.3d 481 (10th Cir. 1996)

(citing Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 584 n. 2 (1983)); Alexander v.

Choate, 469 U.S. 287, 293 (1985) (Title VI only reaches intentional discrimination, unless agency

regulations promulgated pursuant to Title VI provide otherwise) (citing Brown v. Board of Educ.

of Topeka, Shawnee County, Kan., 671 F.Supp. 1290, 1310 (D.Kan.,1987), rev. on other grds.

by Brown v. Board of Educ. of Topeka, Shawnee County, Kan., 892 F.2d 851(10th Cir. 1989)).

The provision within Title VI which prohibits disparate impact is found in § 602,

providing that: "each Federal department and agency which is empowered to extend Federal

financial assistance to any program or activity . . .  is authorized and directed to effectuate the

provisions of section 2000d of this title with respect to such program or activity by issuing rules,

regulations, or orders of general applicability. . . " 42 U.S.C. § 2000d-1.  S.D. ex rel. Dickson v.

Hood, 391 F.3d 581, 606 (5th Cir. 2004).

Based on the Court's independent research on the issue of disparate impact claims under

Title VI, I conclude that Plaintiff may proceed on a Title VI claim which alleges intentional

discrimination, but is foreclosed as to a disparate impact claim brought under Title VI. Alexander

v. Sandoval, 532 U.S. 275, 280 (2001) ( § 601 prohibits only intentional discrimination) (citing

Regents of Univ. of Cal. v. Bakke, 438 U.S. 265 (1978)); Black Educ. Network, Inc. v. AT & T

Broadband, LLC, 154 Fed.Appx. 33, 44 (10th Cir. 2005) (provision in Title VI prohibiting only

intentional discrimination may be enforced by private individuals in lawsuits).  Courts which have

addressed this issue have followed Sandoval, which holds that there is no private right of action to

enforce disparate-impact regulations brought under Title VI of the Civil Rights Act of 1964,

partly because of the enforcement scheme Congress provided in that statute.

    The Tenth Circuit has not published a decision definitively addressing the issue of whether

a plaintiff has a private right of action under a disparate impact theory brought pursuant to Title

VI.  See, e.g., Bryant v. Independent School Dist. No. I-38 of Garvin County, OK, 334 F.3d 928,

930-31 (10th Cir. 2003) (because plaintiffs did not prove by a preponderance of the evidence that

the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

discrimination, court did not address whether disparate-impact claim was foreclosed, based on

Sandoval).  However, there is sufficient indication that the Tenth Circuit's interpretation of the

statute would be similar to the treatment it was given in Sandoval.[8]  While Plaintiff is not

---

    [8] See, e.g., In Peters v. Jenney, et al., 327 F.3d 307 (4th Cir.2003) (adopting Sandoval);
S.D. ex rel. Dickson v. Hood, 391 F.3d 581, 606-07 (5th Cir. 2004) (absence of any
rights-creating language § 601 led to conclusion that Congress did not intend to create a private
right to enforce regulations promulgated under § 602); Wallace v. Chicago Housing Authority
298 F.Supp.2d 710, 711 (N.D.Ill.,2003) (there is no private right of action to enforce
disparate-impact regulations under Title VI); Garvey ex rel. Doe v. Unified School Dist. 262,
unpubl. opin., 2005 WL 2548332, *3 and n.2 (D.Kan.,2005) (acknowledging that Tenth Circuit
has not addressed Sandoval, but nevertheless holding that plaintiff could only proceed under §
601, and rejecting plaintiff's argument that Sandoval recognized a disparate impact claim, based
on dissenting opinion in Sandoval); Franks v. Ross, 293 F.Supp.2d 599, 606 (E.D.N.C.,2003)
(dismissing plaintiff's claim for relief based solely on the implementing regulations promulgated
pursuant to Title VI, § 602, which court found did not create a private cause of action).

challenging regulations promulgated under § 602, a disparate theory claim is still unavailable because such a theory only exists in the context of a challenge to these regulations, and such a challenge cannot be pursued in an action brought by a private individual.  Further, Plaintiff's claim that the distribution of Wilson teacher training or instruction adversely affects minority special education students would not necessarily require a showing of intent to discriminate (as a disparate impact claim), which a plaintiff ordinarily needs to demonstrate in order to prevail in a Title VI case.

In certain circumstances, disparate impact can be evidence of intentional discrimination. Furr v. Seagate Tech., Inc., 82 F.3d 980, 987 n. 4 (10th Cir.1996) (ADEA case); Neal v. Sandia National Laboratories 157 Fed.Appx. 67, 70 (10th Cir. 2005) ("disparate impact may be evidence of intentional  discrimination in certain cases"); Washington v. Davis, 426 U.S. 229, 242 (1976) (invidious discriminatory purpose may often be inferred from the totality of the relevant facts, particularly when a policy or regulation bears more heavily on one race than another).  However, Plaintiff simply cannot win in this case --  whether Plaintiff was allowed to pursue a disparate impact theory under Title VI, or whether Plaintiff's evidence regarding an alleged disparate impact theory was allowed as evidence of intentional discrimination.

In this case, to advance a disparate impact theory, Plaintiff would have to show that APS minority students do not have access to Wilson teachers while non-minority students do, or even that special education teachers of non-minority students were volunteering for Wilson training while special education teachers of minority students were not.   Plaintiff implies, with no substantive evidence for support, that a denial of Wilson instruction to all minority handicapped students is linked to poorer reading scores in the APS schools which have a higher percentage of

minority special education students, and therefore that if Wilson was made available to all minority students, reading scores in these schools would match those of other APS schools such as APS' La Cueva High School ("La Cueva").   See, Pltff's Add'l Fact 11.

Plaintiff offers statistics relating to the minority composition of the student population at West Mesa.  These are relevant as a starting point to show that for the school year 2002-03, West Mesa's student population is mostly minority (African-American or Hispanic); and that APS high schools with a higher non-minority student population had somewhat lower ninth-grade drop-out rates (averaging 15% in the schools with higher non-minority than 28.3% at West Mesa).  Pltff's Statement of Add'l Facts 4 & 5.  These statistics mean nothing in terms of a disparate impact theory unless Plaintiff can show that schools such as West Mesa, with a higher percentage minority student populations, are adversely affected by having fewer West Mesa teachers volunteering for Wilson training, or fewer West Mesa students offered the program.

Defendants present the following facts, supported by statistical evidence and affidavit testimony:

    "    During 2002-03 and 2003-04, 22  APS special education teachers attended the two-day overview, 17 of whom taught at schools where 50% or more of the special education population were minority students.  During this same time-period, 7 APS special education teachers earned a Level I Certification, 6 of whom taught at schools where 50% or more of the special education population were minority students.

    "    During 2002-03, 671 special education students attended a school employing a Wilson-trained teacher and 550 of these students identified as racial minorities (82% minority rate).  In 2003-04, 2,093 special education students attended a school employing a Wilson-trained teacher, and 1,461 of these students identified as racial minorities (70% minority rate).  In 2002-03 and 2003-04, there were no special education teachers training in Wilson from District high schools with special education populations having fewer than 50% minority students.

Defts' SMF 42 & 43.  According to Defendants' facts (which are undisputed by Plaintiff), the earliest time at which a teacher could have earned a Level I Certification in the Wilson Reading Program was spring 2003.  At that time, two high school special education teachers did so – one at Highland High School ("Highland") and the other at Rio Grande High School ("Rio Grande"), with a 75% and 93% (respectively) of students with disabilities who are racial minorities.  Defts' Ex. Stotts' Aff., ¶ 14; Defts' Ex. 3.  In 2003-04 two more special education teachers earned their Level I Certification in Wilson, one at Rio Grande again, and the other at Sandia High School ("Sandia")  (the latter with a 43% racial minority population for disabled students).  For the school year 2004-05, neither of the two APS high schools with the lowest minority population for special education students – La Cueva and Eldorado-- had a certified Wilson instructor on staff until 2004-05.  In contrast, West Mesa had two certified Wilson instructors on staff -- Sky Gross and Sue Kisner -- who both earned certification in Wilson as a Level I instructor during the 2004-05 school year.

The evidence presented by Defendants essentially guts Plaintiff's disparate impact theory and contention that access to Wilson training and instruction was less available or less utilized by APS schools with a higher student population of minority special education students.  This evidence also debunks Plaintiff's contention that APS had a policy, practice or custom amounting to legal discrimination because of a decision to invite, rather than require, special education teachers to train in Wilson.

Plaintiff contradicts these facts with rhetoric and speculation only.  Plaintiff's references to Brown v. Bd. of Topeka, 347 U.S. 483 (1954), see Resp. at 11, are useless.  Brown and its progeny addressed whether educational benefits of the school system was made available to all

students "on equal terms."   Brown, 347 U.S. at 493.  The undisputed facts here show that the reading program Plaintiff alleges to be the panacea for all reading difficulties (an allegation which is not supported by any evidence, as discussed previously) was actually made *more* available to minority special education students, and that *more* teachers who taught in schools with a higher percentage of special education minority students volunteered for and completed Wilson training.

Connected with a disparate impact theory is Plaintiff's assertion that APS should have made Wilson training mandatory instead of voluntary.  This issue has become moot, in light of (1) Plaintiff's failed disparate impact contentions; (2) the fact that there is no constitutional right to a particular reading program; and (3) the lack of any evidence or plausible rationale to show an adverse effect on schools with a majority of minority students because of a voluntary approach to Wilson -- particularly where the undisputed facts show that it was these schools that were actually receiving more Wilson teacher training and student instruction.

Therefore, Plaintiff's Title VI claim under a disparate impact theory fails, both in terms of a separate theory, and in terms of its use as evidence of intentional discrimination.

## IV.  Intentional Discrimination

In order for Plaintiff to withstand summary judgment on her race discrimination claims, Plaintiff must show intentional discrimination.  The foregoing discussion has eliminated any possible showing or inference of discrimination as a result of statistical data.  Thus, what remains is for Plaintiff to show that Defendants' actions or conduct toward Myisha was taken with a racially discriminatory motive.  A claim of discrimination under Title VI is analyzed using the burden-shifting analysis outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Black Educ. Network, Inc. v. AT & T Broadband, LLC., 154 Fed.Appx. at 44.

Plaintiff's claims of intentional discrimination are based on several discrete acts: the denial of Wilson instruction to Myisha, West Mesa's disenrollment of her daughter in the spring of 2004, and Del Norte's refusal to accept Myisha at that time (the latter two acts alleged solely by Myisha's mother, Jessica).

A.      Prima Facie Case and Legitimate Reasons Offered by Defendants

The Court assumes that Plaintiff has established her prima facie case. McCowan v. All Star Maint., Inc., 273 F.3d 917, 922 (10th Cir. 2001) (the "burden of establishing a prima facie case is "not onerous").  The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Jaramillo v. Colorado Judicial Dept, 427 F.3d 1303 (10th Cir. 2005) (citing Tex. Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981)).  If the defendant carries its burden of production, the presumption of discrimination drops out of the case.  Id. (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993)).  The burden then shifts back to the plaintiff, who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination.  Id. (citation omitted)

Defendants have carried their burden of production.  The Wilson Reading System is but one reading method supported by APS for its special education students who have reading difficulties.  Corrective Reading was selected for Myisha as a reading program and was included in Deb Hernandez' English I class for the 2002-03 school year.  Myisha never attended any of these classes.  Until Myisha's self-described change of heart about the importance of school, Myisha's lack of academic success was due to her lack of motivation, truancy, and problems at home.

23

Plaintiff resents Defendants' lengthy description of Myisha's history at APS, and accuses Defendants of trying to shield themselves from liability:  "Defendants devote significant pages and words to illustrating how allegedly "bad" Myisha is – these vindictive arguments, if relevant at all, are relevant only to damages."  Resp. at 9.  The Court could not disagree more.  Facts concerning Myisha's role -- or her mother's role -- in her lack of success are relevant, not only to damages, but also to Defendants' position that any actions taken were legitimate and not discriminatory.  Those facts are relevant also to show that, regardless of what curriculum choices APS made for Myisha (including whether to provide Wilson instruction), none would have had any impact, because these decisions would have been undermined by factors which were under Myisha's control, not APS' control.  The absurdity of Plaintiff's position that APS' denial of Wilson instruction violates Myisha's Title VI rights can be demonstrated by the fact that Myisha is still enrolled in a Wilson Reading program, but has dropped out of school again for the school year 2005-06.

B.    Whether Plaintiff Demonstrates Pretext

Plaintiff can survive summary judgment on her race discrimination claims by showing that the facially nondiscriminatory reason was a cover-up for a decision motivated by unlawful discrimination.  EEOC v. Flasher Co., 986 F.2d 1312, 1316 (10th Cir. 1992)). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).

Plaintiff has not presented any evidence which a reasonable juror could find to be evidence that Defendants' actions toward Myisha were racially motivated.  Myisha herself stated that she did not think APS, any teacher, employee or administrator discriminated against her because of her race. Myisha Garcia Dep. at 148:1-9.  Nor is there evidence that selection of one reading program over another for Myisha was based on her race or ethnic background.  With regard to Plaintiff's allegations of discrimination toward her daughter, Jessica's own description of events is devoid of suggestion that Myisha was disenrolled from West Mesa in the spring of 2004, or rejected from Del Norte around the same time, because she was African-American or Hispanic.

In December 2003, Myisha became involved in an altercation with two other female students while she was still on probation.[9]  Myisha was suspended from school pending an investigation.  At this time, Jessica Garcia discovered that her daughter was pregnant, and became sufficiently upset that Myisha's probation officer intervened and had Myisha sent to a day shelter for a few weeks.  When she started making inquiries about getting Myisha back into West Mesa, Jessica was told that the school considered Myisha a "hazard" to the safety of other students, and suggested transferring to a charter school, such as New Futures.  When Jessica informed the West Mesa administration that she would be moving out of the district soon, the administration suggested that Jessica transfer her daughter to Del Norte.   Jessica stated that West Mesa had made initial inquiries for her about transferring Myisha, but Del Norte never got back to her about setting up the transfer.  When she finally called Del Norte to discuss the transfer, Jessica was told that the enrollment deadline for Del Norte had passed.  After moving into the Del Norte school district, Jessica tried to enroll Myisha in West Mesa, but discovered that Myisha had been

---

[9]  See, DPH Tr. at 894-904 (testimony of Jessica Garcia).

disenrolled.   Thus, Del Norte would not enroll Myisha because she was considered a drop-out. Myisha did finally enroll in Del Norte for the 2004-05 school year.

Viewing the facts favorably to Plaintiff, what we have here at best is bureaucratic confusion and perhaps miscommunication, but not racial discrimination.  Plaintiff's facts regarding alleged discrimination in connection with her disenrollment from West Mesa and rejection from Del Norte in the spring of 2004 can be summed up thus: Plaintiff moving from one school district to another; Myisha's involvement with an altercation that led to her temporary absence from school; Myisha's pregnancy which resulted in her residing at a day shelter instead of home; and school records which listed Myisha as disenrolled from one school and a drop-out from another. Plaintiff has failed to present any facts which infer that APS (i.e., either West Mesa or Del Norte) took any actions which were pretextual for illegitimate or discriminatory reasons.

## CONCLUSION

Plaintiff's race discrimination claims are premised on denial of Wilson instruction, as well as Jessica Garcia's assertions that her daughter was disenrolled from West Mesa and rejected from Del Norte in spring 2004 because of her racial/ethnic background.  There is not, however, a constitutional right to a particular reading program, as such decisions are appropriately left to the states' public education departments and local school officials.

Under United States Supreme Court precedent, Plaintiff may not proceed under a disparate impact theory under Title VI.  Even if Plaintiff could do so, she provides no evidence that such an impact exists.

Finally, Plaintiff has not presented any evidence that any of the Defendants, including the Individual Defendants, took any actions which were pretextual for racial discrimination.  Simply

stated, Myisha's failures in school are not the result of racial discrimination by Defendants, but rather the result of Myisha's own poor choices and bad conduct.  Accordingly, Plaintiff's race discrimination claims under Title VI fail.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment on Race Discrimination Claims **(Doc. 85)** is hereby GRANTED, for reasons described above, dismissing Plaintiff's race discrimination claims against all Defendants in this action.

_____

UNITED STATES DISTRICT JUDGE